IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

PHETPINTHONG SENESACKDA                               PLAINTIFF

            v.                 Civil No. 05-5009

SHERIFF FERGUSON; MAJOR GENE
DRAKE; CAPTAIN HUNTER PETRAY;
and LT. PAUL CARTER                                     DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Phetpinthong Senesackda, a former inmate of the Benton County Detention Center, brings this pro se civil rights action pursuant to 42 U.S.C. § 1983. Senesackda contends his constitutional rights were violated when he was placed on lock-down without procedural due process.

On June 2, 2005, defendants filed a motion for summary judgment (Doc. 19). By order entered on June 30, 2005 (Doc. 23), Senesackda was directed to complete, sign, and return an attached questionnaire that would serve as his response to the summary judgment motion. On July 13, 2005, plaintiff's response to the court's questionnaire (Doc.23) was filed. The summary judgment motion is currently before the undersigned for issuance of this report and recommendation.

**I. BACKGROUND**

Senesackda was arrested on August 27, 2004, on charges of theft of property and breaking and entering and booked into the Benton County Detention Center (BCDC). *Plaintiff's*

-1-

*Response* (hereinafter *Resp.*) at ¶ 1. The pending charges were the sole reason he was incarcerated. *Id.* at ¶ 2.

Senesackda was released to the Washington County Sheriff's Office on August 28th and booked back into the BCDC on August 31, 2004. *Resp.* at ¶ 3. A warrant was issued for his arrest based on a probation violation charge on October 7, 2004. *Id.* at ¶ 4. He was also charged with delivering a controlled substance. *Id.*

On September 22, 2004, Senesackda was a trustee and was asked by Deputy C. Tomlin to clean E-102 and E-103. *Resp.* at ¶ 6. According to Tomlin, he told Senesackda that when he was cleaning he was not to talk to anyone or pass notes to anyone. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 2 at p. 1. Tomlin maintains Senesackda agreed. *Id.*

Senesackda, on the other hand, contends Tomlin only told him to not speak to any inmates. *Resp.* at ¶ 7. Senesackda agreed not to speak to another inmate. *Id.* at ¶ 8.

Senesackda began cleaning E-102 and when he got to Jacob Penn's cell he swept one or two letters under Penn's door. *Defts' Ex.* 1 at p. 1 (two letters); *Resp.* at ¶ 9(A) (one letter). Defendants maintain the letter was about gangs at the detention center. *Defts' Ex.* 2 at p. 3. Senesackda, however, states the letter that went under Penn's door was from Ricky Garcia and was not about gangs. *Resp.* at ¶ 9(B).

Tomlin called Senesackda over to the control area and asked him what he had just done. *Resp.* at ¶ 10. Senesackda replied nothing. *Id.* Tomlin asked a second time and Senesackda again replied nothing. *Id.* at ¶ 11.

AO72A
(Rev. 8/82)

Tomlin then escorted Senesackda to booking. *Resp.* at ¶ 12. When they got to the booking area, Tomlin asked Senesackda one more time what he put under Penn's door and he replied a letter. *Id.* at ¶ 13.

Tomlin talked to Deputy Faulkenberry about what Senesackda had done and it was decided that he would lose his smoke breaks for one week. *Resp.* at ¶ 14. Tomlin told Senesackda that he had lost his smoke breaks for one week. *Id.* at ¶ 15. Senesackda replied okay. *Id.* at ¶ 16.

Tomlin indicates that later when he was booking someone into the facility he saw Senesackda walking out the B-pod door for a smoke break. *Defts' Ex.* 1 at p. 1. However, Senesackda states he does not smoke and only went outside to take a break from working.

When Senesackda was done with his smoke break, Tomlin told Senesackda that he was no longer a trustee and that he needed to go to property and change out of his stripes. *Defts' Ex.* 1 at p. 1. Senesackda maintains Tomlin misunderstood the situation. *Resp.* at ¶ 18. Senesackda states he does not smoke but he was not going to argue with Tomlin. *Id.* Senesackda complied with Tomlin's order. *Id.* at ¶ 19.

On September 28, 2004, when Deputy Buth and Deputy Lisenbee were passing out clean whites in D-pod, all inmates were told to line up by their cell doors. *Resp.* at ¶ 20. Senesackda was standing in another inmate's cell talking. *Resp.* at ¶ 21. Buth told Senesackda to go to his assigned cell and stand in front of the door. *Defts' Ex.* 2 at p. 2.

According to the defendants, Senesackda did not comply and instead walked to a different cell. *Defts' Ex.* 2 at p. 2. Senesackda states his cell was "a ways from the cell I was at

AO72A
(Rev. 8/82)

& I was on my way to my cell when I was told to get my stuff to go to the hole." *Resp.* at ¶ 22. Buth told Senesackda to go to his cell, gather his belongings, and go to D-130 door. *Resp.* at ¶ 23.

Senesackda complied. *Resp.* at ¶ 24. Buth told Senesackda that he was being locked down for disobeying the order of a deputy. *Id.* at ¶ 25. Senesackda was taken to E-pod. *Id.* at ¶ 26.

Senesackda was charged with a disciplinary violation as a result of the incident and found to have disobeyed the order of a deputy. *Resp.* at ¶ 27. He was given ten days look-down and loss of privileges. *Id.* at ¶ 28.

Senesackda appealed the decision and the decision was affirmed. *Defts' Ex.* 2 at p. 4. According to defendants' records, Senesackda admitted to staying to speak to Inmate Bruce after the whites had been brought into the cell. *Id.* Senesackda disagrees. He states he was speaking to Bruce before the whites were passed out. *Resp.* at ¶ 29.

On October 1, 2004, when Deputy Lisenbee entered into E-103 to pass out new whites he noticed Inmate David Perez and Senesackda waiting at the door. *Defts' Ex.* 2 at p. 7. *See Resp.* at ¶ 30 (Plaintiff indicates he is without knowledge to agree or disagree). Lisenbee's incident report provides as follows:

> Inmate Perez handed me a set of boxers and a pair of socks. I threw his old whites away and got his new whites from a trustee. As I handed the new whites to Inmate Perez, he and Inmate Senesackda charged towards me with punches. Inmate Perez struck the left side of my face with his right fist. As I started to gather my bearings, I went towards Perez to detain him from attacking me. I reached my arms towards Perez and Inmate Senesackda pinned both of arms behind me over my head preventing me from grabbing Inmate Perez. Inmate Perez continued to strike at the left side of my face with his right fist. I then pushed Inmate Senesackda against the wall with my legs, stunning him enough

-4-

to get my arms free. As we struggled, we all fell to the ground. I fell onto Inmate Senesackda and pulled Inmate Perez with me. Inmate Perez continued to punch at me. In a defensive effort, I kicked Inmate Perez in the stomach with my right foot, knocking the breath out of him. I then overheard the E103 door open and Inmate Senesackda yelled, "here comes more of them, get on the ground." Both inmates rolled over on their stomachs. I jumped onto Inmate Perez to place him in handcuffs. He then lifted himself with his arms, resisting against me. I placed both of my hands on the back of his neck to prevent him from rising up again and in the process his head bounced against the floor. Inmate Senesackda was lying on the floor next to Inmate Perez. He then stated, "you slammed his head against the floor." He proceeded to stand up making aggressive gestures towards me. Knowing Deputy Cantwell had entered the E103 Pod and had Inmate Perez's legs detained, I rose up to take Inmate Senesackda down. He immediately resisted against me. I grabbed his right arm and with the assistance of Deputy Tomlin we both took him down to the floor. I placed Inmate Senesackda into handcuffs and double locked them.

*Defts' Ex.* 2 at pps. 7-8.

Senesackda disagrees with Lisenbee's version of the events. Senesackda indicates that when he was handed his whites, he turned around to place them on his bunk. *Resp.* at ¶ 31. Senesackda indicates he is without knowledge to agree or disagree as to whether Perez struck Lisenbee. *Id.* at ¶ 32, ¶ 34, & ¶ 37.

Senesackda denies that he pinned Lisenbee's arms over his head, that Lisenbee pushed him against the wall or that he fell to the ground with Lisenbee; Instead, Senesackda states he left his cell and got on the ground. *Resp.* at ¶ 33, ¶ 35 & ¶ 36. He also denies that he knew anyone else was coming into the pod. *Id.* at ¶ 38. Senesackda indicates he merely hollered for Perez to get on the floor and he did. *Id.*

Senesackda maintains Lisenbee slammed Perez's head into the concrete floor. *Resp.* at ¶ 40 & ¶ 41. Senesackda admits he stood up but contends the move was not aggressive. *Id.* at ¶ 42. He states he stood up in case Lisenbee wouldn't stop slamming Perez's head against the floor. *Id.* If Lisenbee didn't stop, Senesackda states he was going to pull Lisenbee off to prevent

Perez's head being split open because Lisenbee was getting carried away and being unprofessional. *Id.*

By this time, Deputy Cantwell had come to assist Lisenbee. *Resp.* at ¶ 43. Cantwell took a hold of Perez's legs. *Id.* Senesackda denies that he resisted Lisenbee but says he stood there staring at him. *Id.* at ¶ 45. When Deputy Tomlin arrived and asked Senesackda to get on the floor, he states he complied. *Id.* Senesackda was placed in handcuffs and escorted to pod control. *Id.* at ¶ 46.

Lisenbee was taken to the hospital for treatment. *Defts' Ex.* 2 at p. 8. He had a fracture of his left cheekbone, was bleeding from the nose, had severe bruising under his left eye, and a laceration over his left ear. *Id.*

According to defendants, following the incident, Senesackda was placed in red and white stripes and Deputy Faulkenbury told him that he would be on twenty-four hour look-down and would be shackled anytime he was out of his cell. *Defts' Ex.* 2 at p. 13. On October 2, 2004, Senesackda indicates he was told by Deputy Ransom that Senesackda was not to be allowed any recreation or privileges for as long as he was at the BCDC. *Resp.* at ¶ 49. Senesackda indicates Perez was told the same thing. *Id.*

Senesackda indicates the only disciplinary he had was the one he was given on September 27th. *Resp.* at p. 32. As a result of this disciplinary, he was put on lock-down for ten days and lost his privileges during that time period.

Following the October 1st incident, Senesackda indicates there was no paperwork. *Resp.* at ¶ 32. Instead, he states he was put on lock-down without privileges twenty-four hours a day seven days a week on the assumption that he attacked a deputy. *Id.* Senesackda states he was

AO72A
(Rev. 8/82)

told that from October 1, 2004, until April 5, 2005, he was on administrative segregation. *Id.* However, he states the paper signed by Captain Petray indicating Senesackda was put on administrative segregation is dated April 5, 2005. *Id. See also attached "administration segregation action form* dated 4/5/05 indicating Senesackda is a threat to others and a threat to the security of the detention facility (same document submitted to the court as *Defts' Ex.* 2 at p. 53). Furthermore, if he was on administrative segregation instead of lock-down, Senesackda questions why he received no privileges. *Id.*

Senesackda was charged with second degree battery as a result of the incident. *Resp.* at ¶ 50(A). On October 6, 2004, an order of probable cause for continued detention was signed and a $10,000 bond set on the battery charge. *Id.* at ¶ 50(B). The charge is still pending. *Id.* at ¶ 51.

In response to one of Senesackda's requests dated October 29, 2004, he was told he was due off look-down on November 10th. *See Defts' Exhibit* 2 at p. 26. Senesackda maintains he did not get off look-down until April 5, 2005. *Resp.* at ¶ 52.

Senesackda was placed on suicide watch for one night in December of 2004. *Id.* at ¶ 66. Senesackda contends this was due to a misunderstanding. *Id.*

In Senesackda's opinion he was not a danger to the deputies. *Resp.* at ¶ 53. He indicates he gave no signs of any threat to the deputies nor did he give them any problems. *Id.*

Senesackda was allowed to shower every three or four days. *Resp.* at ¶ 54. However, he was shackled, cuffed, and escorted to the shower and back. *Id.*

Senesackda could send and receive both personal and legal mail. *Resp.* at ¶ 55. He had access to newspapers or some other source of information regarding news and current events but did not have access everyday. *Resp.* at ¶ 56. Additionally, he didn't get access unless he kept

AO72A
(Rev. 8/82)

asking. *Id.* Senesackda maintains he also had to keep writing grievances in order to be provided with indigent supplies such as paper and pens, etc. *Id.* at ¶ 61.

He was given the opportunity to exercise inside his cell but was not allowed outside recreation. *Resp.* at ¶ 57(A). There was sufficient room in his cell to do push ups, sit ups, jumping jacks, or similar exercises if Senesackda desired to do so. *Id.* at ¶ 58. Although defendants maintain Senesackda refused recreation on a number of occasions, *defts' ex.* 3, Senesackda states he would never refuse recreation and remained locked in his cell twenty-four hours a day seven days a week. *Resp.* at ¶ 57(B).

The cell was eight foot by ten foot in size. *Resp.* at ¶ 59. It had bunks, a table with a stool, a sink, a shelf, and a commode. *Id.*

Senesackda indicates he lost visitation, recreation, and phone call privileges. *Resp.* at ¶ 60. He states this caused him to suffer stress, depression, and mental anguish because he could not call his family or receive visits before he left for prison. *Id.*

Senesackda did not see, speak to, or otherwise communicate with Sheriff Ferguson or Major Drake about his being on look-down. *Resp.* at ¶ 63 & ¶ 65. He has no evidence Sheriff Ferguson or Major Drake were involved in the decision to place him on look-down. *Id.* at ¶ 62 & ¶ 64.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## III. DISCUSSION

Defendants have moved for summary judgment. They contend Senesackda cannot present a genuine issue of material fact as to whether he was denied due process. Further, they state he can prove no harm by the alleged denial of exercise or phone and visitation privileges.

On September 28, 2004, defendants indicate Senesackda was placed on lock-down for disobeying the order of a deputy. Following the October 1, 2004, attack on a deputy, defendants state Senesackda was charged with second degree battery and also placed on lock-down. Defendants indicate Senesackda lost certain privileges for a time because of the attack.

"We begin with the fundamental principle that a person held in confinement as a pretrial detainee may not be subjected to any form of punishment for the crime for which he is charged." *Rapier v. Harris*, 172 F.3d 999, 1002 (7th Cir. 1999). *See also Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992)("Pretrial detainees are presumed innocent and may not be punished.").

AO72A
(Rev. 8/82)

Under *Bell v. Wolfish*, 441 U.S. 520, 538, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979), "restrictions on pretrial detainees that implicate a liberty interest protected under the Due Process Clause may not 'amount to punishment of the detainee.'" *Benjamin v. Fraser*, 264 F.3d 175, 188 (2nd Cir. 2001). "However, not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996).

"Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention." *Bell*, 441 U.S. at 537. In determining whether a particular restriction constitutes a permissible restriction or amounts to impermissible punishment, the court first asks "whether the restriction is based upon an express intent to inflict punishment." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002)(citations omitted), *cert. denied*, ___ U.S. ___, 123 S. Ct. 2110, 155 L. Ed. 2d 1087 (2003). If "there is no indication of such an express intent," the court next considers "whether punitive intent can be inferred from the nature of the restriction." *Valdez*, 302 F.3d at 1045.

In this regard, the Supreme Court in *Bell* held that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539. "An action may be reasonably related to a legitimate governmental purpose if an alternative purpose to which the act may rationally be connected is assignable for it and the action does not appear excessive in relation to the alternative purpose assigned." *Robles v. Prince George's County, Maryland*, 302 F.3d 262, 269 (4th Cir. 2002)(internal citations and punctuation omitted), *cert. denied*, ___ U.S. ___, 123 S. Ct. 1634, 155 L. Ed. 2d 486 (2003).

AO72A
(Rev. 8/82)

> A reasonable relationship between the governmental interest and the challenged restriction does not require an "exact fit," nor does it require showing a "least restrictive alternative." Otherwise, every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Moreover, it does not matter whether we agree with the defendants or whether the policy in fact advances the jail's legitimate interests. The only question that we must answer is whether the defendants' judgment was rational, that is, whether the defendants might reasonably have thought that the policy would advance its interests.

*Valdez*, 302 F.3d at 1046.

In *Higgs v. Carver*, 286 F.3d 437 (7th Cir. 2002), the Seventh Circuit stated:

> A pretrial detainee cannot be placed in segregation as a punishment for a disciplinary infraction without notice and an opportunity to be heard; due process requires no less. But no process is required if he is placed in segregation not as punishment but for managerial reasons. Suppose for example that the only vacant cell left in the jail was in the segregation ward when a new prisoner arrived; placing him in that cell would be a managerial decision. Or suppose, . . . that a prisoner was placed under particularly restrictive conditions of confinement at the jail because he was considered a suicide risk. Again, no hearing would be required. Ditto if he was placed in segregation to protect himself from other prisoners, or to protect jail staff from his violent propensities. As long as the purpose was indeed preventive rather than a punitive one, he would not be entitled to notice and a hearing. . . . In none of these cases would a hearing be practicable, or even useful, because managerial decisions do not have the character of rulings applying legal standards to facts, the kind of rulings for which adjudicative hearings are designed.

*Id.* 286 F.3d at 438. *See Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992)("Requiring a pretrial detainee to work or be placed in administrative segregation is punishment. . . . Regardless of whether the detentions are classified as 'administrative,' if a pre-trial detainee must remain in a lock-up area if he does not work, the detention amounts to punishment.").

It is not clear from the materials submitted when Senesackda was released from "lock-down" following his alleged attack on Lisenbee on October 1, 2004. *See e.g., Defts' Ex.* 2 at p. 24 (no privileges until lock-down lifted–dated October 22, 2004); p. 26 (due off lock-down

on November 10, 2004–dated November 1, 2004); (lock-downs do not get phone calls except for bondsmen and attorneys dated December 10, 2004); p. 32 ( Senesackda voices complaints about being on lock-down–Petray responded on December 20, 2004, that Senesackda was being charged with assaulting a deputy); p. 34 (eligible for visitation privileges–dated December 29, 2004); p. 50 (Petray states he will review Senesackda lock-down status–dated March 28, 2005); p. 53 ( Senesackda placed on administrative segregation because he is a threat to others and to the security of the facility–dated April 5, 2005). However, Senesackda essentially argues that whether it was called disciplinary lock-down or administrative segregation, the fact remains that he was on lock-down twenty-four hours a day seven days a week beginning on October 1, 2004, until April 5, 2005, and during this time had no privileges.

Clearly there may be permissible non-punitive reasons for confining pretrial detainees to disciplinary segregation, lock-down, or administrative segregation; Just as clearly placement in such housing may constitute a form of punishment. *See Zarnes v. Rhodes*, 64 F.3d 285, 291 n.5 (7th Cir. 1995)*; House v. Vaught*, 993 F.2d 1079, 1085-86 (4th Cir. 1993)(administrative segregation may not be used as pretext for indefinite confinement); *Brown-El v. Delo*, 969 F.2d 644, 647 (8th Cir. 1992)(detention center has a legitimate interest in segregating individual inmates from general population for non-punitive reasons, such as where there is a threat to the safety and security of the institution); *O'Bar v. Pinion*, 953 F.2d 74, 84-85 (4th Cir. 1991)(recognizing that administrative segregation can be a form of punishment).

In this case, we believe there are genuine issues of fact as to whether Senesackda's due process rights were violated when he was placed on "lock-down" following the incident with Lisenbee. Defendants indicate Senesackda was placed "on lockdown for the attack." *Defts'*

*Statement of Indisputable Material Facts* at ¶ 6 (Doc. 21)(sworn to under penalty of perjury by Captain Hunter Petray pursuant to 28 U.S.C. § 1746). Defendants maintain Senesackda was also believed to be a danger to the deputies. *Id.* at ¶ 7.

"A pre-trial detainee is entitled the procedural protections of *Wolff v. McDonnell*, 418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974), before imposition of punishment for a disciplinary infraction." *Jones v. Brown*, 300 F. Supp. 2d 674, 678 (N.D. Ind. 2003). Nothing before the court indicates Senesackda received any type of hearing prior to, or after, his assignment to "lock-down" as a result of the incident with Lisenbee. Senesackda was not given an opportunity to present his views to the official who decided he should be placed on lock-down. Senesackda was not charged with a rule violation and did not have a disciplinary hearing. Although Senesackda was charged with a crime as a result of the incident, it is clear he cannot be punished for this crime having not yet been convicted of it.

While an inmate striking a detention center officer presents a legitimate security concern, defendants submitted nothing tending to establish that Senesackda had shown violent propensities either before or after this event. Senesackda only had one disciplinary infraction prior to the incident with Lisenbee and this was for disobeying a deputy. It did not tend to show he had violent propensities or had threatened to do physical harm to detention center personnel or to other inmates. There is no evidence that after the incident with Lisenbee that Senesackda continued to be unruly or violent.

No evidence was introduced showing that prior to the October 1st incident that Senesackda was classified as a security risk. He had not been assigned to an area of the jail with more restrictive conditions of confinement in light of his being viewed as a security risk. After

AO72A
(Rev. 8/82)

the incident with Lisenbee, nothing indicates Senesackda was moved to, or kept on, lock-down because he was viewed as a security threat rather than as punishment for his role in the incident with Lisenbee. In fact, it was not until April 5, 2005, that Captain Petray completed a form indicating Senesackda would be housed in administrative segregation because he was viewed as a threat to others and to the security of the facility.

With respect to Sheriff Keith Ferguson and Major Gene Drake, we find there is no genuine issue of material fact as to whether they can be held liable for any alleged constitutional violation. A supervisor may not be held liable for a section 1983 violation on the basis of *respondeat superior*. *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Senesackda has not alleged that either Sheriff Ferguson or Major Drake directly participated in the alleged constitutional violation or that a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights. *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir.1996) (*citing Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir.1994); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility). Further, the record in this case is devoid of any suggestion of the existence of a custom or policy on which to hold Benton County liable. In short, there is nothing to suggest Senesackda's alleged constitutional deprivations were caused by a custom or policy of Benton County.

### IV. CONCLUSION

I therefore recommend that defendants' motion for summary judgment be granted in part and denied in part. Specifically, I recommend that it be granted as to the plaintiff's claims

AO72A
(Rev. 8/82)

against Sheriff Keith Ferguson and Major Gene Drake. I recommend that the summary judgment motion be denied as to Captain Hunter Petray and Lt. Paul Carter.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 15th day of September 2005.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)