IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

PHETPINTHONG SENESACKDA                                    PLAINTIFF

v.                    Civil No. 05-5009

CAPTAIN HUNTER PETRAY;
and LT. PAUL CARTER                                        DEFENDANTS

### **REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Before the undersigned for report and recommendation is the civil rights complaint filed by Phetpinthong Senesackda, currently an inmate of the Arkansas Department of Correction (ADC). Senesackda proceeds pro se and *in forma pauperis*.

While detained at the Benton County Detention Center, Senesackda contends his constitutional rights were violated when he was placed on punitive housing assignment without procedural due process. An evidentiary hearing was conducted on April 25, 2006. At the conclusion of the hearing, the matter was taken under advisement pending the preparation of this report and recommendation.

### I. BACKGROUND and EVIDENCE PRESENTED

At the evidentiary hearing, the court heard the testimony of a number of witnesses. For purposes of discussion, the court will summarize in the first person the testimony given.

*Phetpinthong Senesackda*

I'm twenty one years old. I was booked into the Benton County Detention Center (BCDC) on August 27, 2004. I was transferred to Washington County on August 28, 2004. I was sent back to the BCDC on August 31, 2004. A probation violation warrant was issued in

-1-

October of 2004. I stayed at the BCDC until April 7, 2005, when I was transferred to the ADC.

I was placed on lock-down without a hearing. I spent the first two or three months in the general population. I was on lock-down the remainder of the time I was at the BCDC. I didn't have any privileges–no phone calls, no privileges. I was in my cell twenty-four hours a day. I didn't get my hour out for exercise.

The first time I got into trouble was for disobeying a direct order of a deputy when clothes were being passed out. *See Defendants' Exhibit* 10 at page 2 (incident report dated 9/22/2004). Deputy Buth was passing out whites. I was in a cell when Buth came around. We didn't know they called whites. We didn't hear it. We were in a cell talking. The deputy came to the cell and asked us to get out. I was on my way to my cell. He didn't think I was. He said I was going to the hole. There is no arguing with Buth.

There was a hearing. *Defendants' Exhibit* 11 (disciplinary action form dated 9/28/2004). I was called out of the hole. I tried to appeal. Lt. Carter said ten days and after that I would be released to population. *Id.*

On October 1, 2004, an incident happened in the hole. An inmate got into it with Lisenbee. It was another inmate in there. Sometimes there is another inmate in the hole at the same time.

Lisenbee and the other inmate, Perez, got into it. I played no part in the incident. Lisenbee provoked the incident. He said Perez was weak. Perez attacked Lisenbee after the cell door opened. This occurred when Lisenbee was passing out whites. Lisenbee told Perez to get to the ground. I told Lisenbee he was wrong to slam Perez to the floor. I was going to confront Lisenbee.

AO72A
(Rev. 8/82)

Lisenbee called for assistance. I got to the ground. I told Perez to go to the ground. I was going to get back up and confront Lisenbee. I got back up. Tomlin came in. Perez was in cuffs when Lisenbee slammed Perez's head to the ground.

We were taken to pod control. We were questioned. I was taken back to the hole and placed in red and white stripes. Red and white stripes means high security. The red and white stripes are used so everyone knows the inmate is violent. I didn't receive any hearing or any written notice of the charges against me.

I stayed in the hole until I was transferred to prison. I stayed in red and white stripes. I put in a few requests trying to get out of lock-down.

While you are in the hole, you do not get phone calls or visitation. You do get mail and food. You are confined twenty-four hours a day in a cell that is approximately eight foot by ten foot in size. You are locked out of the day-room unless a deputy allows you access. There is enough room to do exercises such as push-ups, jumping jacks, or running in place in the cell.

You are supposed to get an hour out a day but I didn't get it. I did get out for showers. For awhile, I didn't get to come out and use the phone. Eventually, I was released from the cell occasionally to make calls.

I didn't go to recreation. I never refused recreation. I did go to church. I received a newspaper. For awhile I was given cleaning supplies and cleaned my cell. Later, the trustees started cleaning the cells.

AO72A
(Rev. 8/82)

I didn't hit Lisenbee. Later, I did plead guilty to battery in the second degree for hitting Lisenbee. I pled guilty on other charges. I got twenty-four years in prison. I would have caught more time if I hadn't pled. When I pled, I admitted to the judge that I did it.

### *Jamie Dragovich*

I'm a first class deputy at the BCDC. Senesackda was on 24/7 lock-down and administrative-segregation. Senesackda was shackled and cuffed when he was taken to the shower a few times a week. He did not receive recreation. You are not offered recreation when you are on 24/7 lock-down. When an inmate was on 24/7 lock-down, the inmate was provided with a list of exercises the inmate could do in his cell. Inmates who are given recreation, are allowed out into the day-room. There was no problem with Senesackda using the phone.

Inmates are put in red and white stripes to let the deputies know the inmate is violent or has fleeing in his record. It lets the deputies know to keep an eye on that inmate.

I worked the day shift from 7:00 a.m. to 5:00 p.m. on weekends from October of 2004 until April of 2005. When I took an inmate to the shower, I logged it on the log book and into the computer on the activity report. I never logged what didn't occur.

Senesackda was on administrative-segregation for assaulting a deputy. This was to prevent harm to the facility and the deputies. When he came out of his cell, he was accompanied by two deputies and he was handcuffed and shackled. All precautions were taken.

### *Bethany Ledbetter Donahoe*

I'm a jail clerk. Senesackda was on administrative-segregation 24/7. Inmates are placed in red and white stripes for the safety of the deputies.

AO72A
(Rev. 8/82)

When you are on administrative-segregation you don't get recreation. You get a shower every three days and can use the phone. On lock-down you get an hour of recreation. On administrative-segregation you do not get it.

I witnessed the incident with Lisenbee in pod control. I was putting out medication. Cantwell told me that we were going to have a problem. When the door opened, Senesackda and Perez charged Lisenbee. One of the inmates had Lisenbee's hands behind his back. The other inmate was hitting Lisenbee. It took ten to fifteen seconds for deputies to respond.

### Bud Duncan

I've been a volunteer jail minister for five or six years. Senesackda was on 24/7 lock-down. When he came to church, he was in shackles and cuffs.

I go with the flow of things. I'm not put off by things at the jail. Church is a different thing at jail. We have to have church as we can.

It varies the number of times I go–usually three to four times a week. There are ministry rooms there. I administer to all religions.

I'm surprised to hear Senesackda is a Buddhist. We only did Christian things and he was very open to it. He never told me he was a Buddhist.

### Captain Hunter Petray

I work for the Benton County Sheriff's Office. I am the jail administrator. I have been in that position for going on four years. I am the custodian of the jail records.

The BCDC maintains a mail log. *See Defendants' Exhibit* 20 (Log of Senesackda's Mail). The jail clerks enter incoming and outgoing mail. A note is made of the date the mail is

sent or received under the inmate's name and the sender's or recipient's name. Mail is never interrupted.

We also maintain telephone logs. *See Defendants' Exhibit* 21 (Log of Senesackda's phone calls from 8/31/2004 through 4/7/2005). The logs are produced from the inmate phone system. It records the destination phone number. The inmate has to enter a pin number to use the phone. The length of the call is also recorded. The telephone log for October 31, 2004, through April 7, 2005, shows Senesackda made 1202 phone calls. *Id.* The phones are in the day area. Senesackda had to have been let out of his cell to use the phone.

The activity report is what is used to log daily activities such as feeding, church, recreation. *See e.g., Defendants' Exhibit* 22 (Log of Senesackda's activities from 8/31/2004 through 4/7/2005). The activities of each inmate are logged. The log can be sorted by inmate.

We maintain three hard bound books which are actual log books. These are hard copies of the information that goes into the computer. The log books also contain additional things like observations of the deputies. Basically these are pass down logs. I found various activities listed for Senesackda including recreation, shower, church, newspapers.

The red and white stripes are used to let the deputies know the inmate has a violent history. It puts the deputies on notice that they should take precautions.

Administrative-segregation is when an inmate is confined to his cell because he is considered to be a harm to other inmates or to himself. Mainly it is used for inmates who have a history of violence and can't get along with other inmates. These inmates must be kept by themselves.

AO72A
(Rev. 8/82)

Senesackda was on administrative-segregation because of the incident with Lisenbee. Jailers have a duty to protect inmates from other inmates. Senesackda was a trustee initially. He committed a number of violations and that status was withdrawn.

Senesackda had no visitors while he was at the BCDC. This was true even before he was put on lock-down or administrative-segregation. Inmates on administrative-segregation get showers, they exercise in their cells, they get newspapers, they go to court, and they are allowed to communicate with their attorney.

I don't think Senesackda and Perez were trying to escape. Their attack on Lisenbee was unprovoked.

Under the policy on inmate rules and discipline, when an incident occurs a report is prepared. *Defendants' Exhibit* 16. A disciplinary form is created and the inmate gets a copy if he requests one. There is an initial hearing before a neutral party. The inmate can appeal if he disagrees with the decision.

No jail disciplinary was ever prepared with respect to Senesackda or Perez. I don't know why Senesackda wasn't given a disciplinary but this fact leads me to believe they were put on administrative-segregation not punitive lock-down. They were referred to the prosecutor.

Initially there was some confusion about whether Senesackda was on lock-down or administrative-segregation. On October 8, 2005, Senesackda submitted a request in which he stated he understood that he would be on lock-down 24/7. *Defendants' Exhibit* 6 at page 7. He stated he didn't get any disciplinary and he wanted to know how much longer he would be on lock-down before he got visitation and a mat. *Id.* He also asked for information on his probable

cause paperwork and on his court dates. *Id.* My response does not address his question about lock-down.

On October 21, 2004, Senesackda submitted another request asking when he would get off lock-down. *Defendants' Exhibit* 6 at page 8. In response to this request, Sgt. Ponge told him: "You are on lockdown-until your lockdown gets lifted you do not have any privileges." *Id.*

On October 29, 2004, Senesackda submitted another request. *Defendants' Exhibit* 6 at page 9. In response to this request, I told him he was due off lockdown on the 10th of November. *Id.*[1]

On December 12, 2004, Senesackda submitted a request. *Defendants' Exhibit* 6 at page 10. In response to this request, Sgt. Ponge stated: "Lockdowns do not get a phone calls. Only for Bondsman & Attorney and a Deputy has to call for you." *Id.*

On December 18, 2004, Senesackda submitted a grievance in which he stated that since he was on administrative segregation he wanted to know if he could shower and clean his cell once every three days instead of every three to four days. *Defendants' Exhibit* 12 at page 4. He had submitted another grievance dated December 20, 2004, in which he stated being locked up twenty-four hours a day, seven days a week was really breaking him down mentally. *Id.* at page 5. I responded to his grievance dated the 18th on the 22nd and I wrote that he had been placed in an anti-suicide smock for his protection and moved to booking. *Id.* at page 4.

---

[1] Although not mentioned by Petray during his testimony, the defendants' exhibits also contain a grievance from Senesackda dated November 8, 2004. *Defendants' Exhibit* 12 at page 3. Senesackda stated he had been on twenty-four hour a day lock-down since October 1, 2004, and wished to be allowed recreation. *Id.* In response, Petray wrote: "You attacked a deputy along with another inmate causing injuries. You were told you can rec. inside your cell and were given a list of exercises to do so." *Id.*

On March 25, 2005, Senesackda submitted a grievance in which he stated he had been on lock-down twenty-four hours a day, seven days a week, since October 1st and not allowed recreation. *Defendants' Exhibit* 12 at page 6. He asked about getting his status lifted. *Id.* In response, I told him the lieutenant and I would review his lock-down. *Id.*

An administrative-segregation action form was not completed until April 5, 2005. *Defendants' Exhibit* 13. It stated Senesackda was on administrative-segregation because he was a threat to the deputies. *Id.* On the bottom of the form, it has a place for administrative review of the decision. *Id.* We did this administrative-segregation action form because we could not find a form that had been done before. Usually a decision to place someone in administrative-segregation is reviewed once a month.

A lot of times if an inmate attacks a deputy, the inmate spends his entire time in administrative-segregation. However, we do look at the inmate's behavior. I probably would not have changed Senesackda's status if I had reviewed it.

A lock-down is not necessarily the result of violent behavior. Once the inmate does his time, ten days or whatever punishment is assessed, the inmate is released. Normally a lock-down does not exceed thirty days for each violation. During lock-down, the inmate gets no privileges only phone calls with attorneys.

A violent inmate would be placed in administrative-segregation because they cannot go back into the general population. An inmate on administrative-segregation retains their privileges. They get book cart, visitation, phone privileges. There was some confusion on Senesackda's status.

AO72A
(Rev. 8/82)

### *Michael Lisenbee*

I'm a corporal. I work in the jail.

When the incident occurred on October 1, 2004, I was passing out whites. *See Defendants' Exhibit* 10 at pages 4-5. Whites were passed through the cell door. I called for Senesackda and Perez. Once the whites were exchanged both charged me.

Senesackda pinned my arms behind me. Perez was hitting me. The struggle lasted for two to three minutes. I freed myself from Senesackda by charging him against the wall. We all fell to the floor. We got up again.

Deputies responded. Senesackda said here come the deputies get to the floor. I got up to secure Perez. Perez attempted to get up. I secured his upper body. When I did, his head fell onto the floor. Senesackda saw Perez's head fall. Senesackda rose up and said that is messed up.

With Tomlin's assistance, Senesackda was placed in restraints and taken to the pod control area. I went to the hospital and had x-rays taken. I had a hairline fracture of the left cheekbone, bruising, and swelling that lasted a couple of weeks, and a laceration over my left ear.

### *Robert Crowe*

I'm a patrol deputy. I was in this position in October and November of 2004.

I went to the hospital to take photographs of Lisenbee. *Defendants' Exhibit* 23. The photographs show the injuries to his cheekbone and above his left ear.

AO72A
(Rev. 8/82)

### *Charles Tomlin*

In October and November of 2004, I worked in the jail. I was one of the first deputies responding to the call for assistance. I was entered E-103. Lisenbee was securing Perez by placing handcuffs on him. When I arrived, Senesackda was on the floor.

Before I approached Senesackda, Lisenbee was on him and freed up one arm and was trying to get the cuffs on him. Senesackda resisted. We got the cuffs on him. Senesackda was agitated.

### *Paul Carter*

I'm in the detention division. I occupied the same position in April of 2005.

I heard about the incident with Lisenbee the day it occurred. Faulkenberry called me. I called Petray. The decision was made to put Senesackda on administrative segregation on October 1st until we could sort it out and do interviews.

The deputies are to complete incident reports. The sergeants prepare the disciplinary reports.

It was unclear to the deputies what status Senesackda was on. The fact that he was referred for prosecution might have caused some of the confusion.

I completed the affidavit of probable cause and interviewed the inmates and deputies involved. *See Defendants' Exhibit* 19. Senesackda claimed he didn't harm Lisenbee. The trustees told me the same story as the deputies.

For the safety of the deputies, an inmate who assaults a deputy is placed on administrative-segregation for the remainder of his stay. This is true regardless of the inmate's lock-down status. On October 1st, Senesackda was on disciplinary lock-down.

AO72A
(Rev. 8/82)

## II. DISCUSSION

"We begin with the fundamental principle that a person held in confinement as a pretrial detainee may not be subjected to any form of punishment for the crime for which he is charged." *Rapier v. Harris*, 172 F.3d 999, 1002 (7th Cir. 1999). *See also Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992)("Pretrial detainees are presumed innocent and may not be punished."). Under *Bell v. Wolfish*, 441 U.S. 520, 538, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979), "restrictions on pretrial detainees that implicate a liberty interest protected under the Due Process Clause may not 'amount to punishment of the detainee.'" *Benjamin v. Fraser*, 264 F.3d 175, 188 (2nd Cir. 2001). "However, not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996).

"Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention." *Bell*, 441 U.S. at 537. In determining whether a particular restriction constitutes a permissible restriction or amounts to impermissible punishment, the court first asks "whether the restriction is based upon an express intent to inflict punishment." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002)(citations omitted), *cert. denied*, ___ U.S. ___, 123 S. Ct. 2110, 155 L. Ed. 2d 1087 (2003). If "there is no indication of such an express intent," the court next considers "whether punitive intent can be inferred from the nature of the restriction." *Valdez*, 302 F.3d at 1045.

In this regard, the Supreme Court in *Bell* held that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539. "An action may be reasonably

related to a legitimate governmental purpose if an alternative purpose to which the act may rationally be connected is assignable for it and the action does not appear excessive in relation to the alternative purpose assigned." *Robles v. Prince George's County, Maryland*, 302 F.3d 262, 269 (4th Cir. 2002)(internal citations and punctuation omitted), *cert. denied*, ___ U.S. ___, 123 S. Ct. 1634, 155 L. Ed. 2d 486 (2003).

> A reasonable relationship between the governmental interest and the challenged restriction does not require an "exact fit," nor does it require showing a "least restrictive alternative." Otherwise, every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Moreover, it does not matter whether we agree with the defendants or whether the policy in fact advances the jail's legitimate interests. The only question that we must answer is whether the defendants' judgment was rational, that is, whether the defendants might reasonably have thought that the policy would advance its interests.

*Valdez*, 302 F.3d at 1046.

In *Higgs v. Carver*, 286 F.3d 437 (7th Cir. 2002), the Seventh Circuit stated:

> A pretrial detainee cannot be placed in segregation as a punishment for a disciplinary infraction without notice and an opportunity to be heard; due process requires no less. But no process is required if he is placed in segregation not as punishment but for managerial reasons. Suppose for example that the only vacant cell left in the jail was in the segregation ward when a new prisoner arrived; placing him in that cell would be a managerial decision. Or suppose, . . . that a prisoner was placed under particularly restrictive conditions of confinement at the jail because he was considered a suicide risk. Again, no hearing would be required. Ditto if he was placed in segregation to protect himself from other prisoners, or to protect jail staff from his violent propensities. As long as the purpose was indeed preventive rather than a punitive one, he would not be entitled to notice and a hearing. . . . In none of these cases would a hearing be practicable, or even useful, because managerial decisions do not have the character of rulings applying legal standards to facts, the kind of rulings for which adjudicative hearings are designed.

*Id.* 286 F.3d at 438. *See Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992)("Requiring a pretrial detainee to work or be placed in administrative segregation is punishment. . . .

-13-

Regardless of whether the detentions are classified as 'administrative,' if a pre-trial detainee must remain in a lock-up area if he does not work, the detention amounts to punishment.").

The issue in this case is whether Senesackda's being placed in "administrative segregation" or "lock-down" from October 7, 2004, the day the ten day disciplinary lock-down assessed for the incident with Buth ended, until April 7, 2005, was for punitive reasons. Clearly there may be permissible non-punitive reasons for confining pretrial detainees to administrative segregation. Just as clearly placement in administrative segregation may constitute a form of punishment. *See Zarnes v. Rhodes*, 64 F.3d 285, 291 n.5 (7th Cir. 1995)*; House v. Vaught*, 993 F.2d 1079, 1085-86 (4th Cir. 1993)(administrative segregation may not be used as pretext for indefinite confinement); *Brown-El v. Delo*, 969 F.2d 644, 647 (8th Cir. 1992)(detention center has a legitimate interest in segregating individual inmates from general population for non-punitive reasons, such as where there is a threat to the safety and security of the institution); *O'Bar v. Pinion*, 953 F.2d 74, 84-85 (4th Cir. 1991)(recognizing that administrative segregation can be a form of punishment).

In this case, we believe Senesackda has presented evidence of punitive intent. It appears clear from the testimony that there was an intent to punish Senesackda for his actions in taking part in the assault on Lisenbee. While an inmate striking detention center personnel presents a legitimate security concern, there was no testimony establishing that Senesackda had shown violent propensities either before or after this event. In fact, other than the problem he had with Buth when passing out whites just a few days before, the testimony was that Senesackda was basically a compliant inmate and they had experienced no difficulties with him either before or after the incident with Lisenbee. Certainly, there was no testimony tending to show he had

-14-

AO72A
(Rev. 8/82)

violent propensities, had on other occasions threatened to do physical harm to detention center personnel or to other inmates, or continued to be unruly or violent after the incident with Lisenbee. No evidence was introduced showing that prior to the October 1st incident that Senesackda was classified as a security risk. He had not been assigned to an area of the jail with more restrictive conditions of confinement in light of his being viewed as a security risk. The testimony also established that Senesackda was held in conditions much more restrictive than those imposed on inmates in the general population following the October 1st incident.

While certainly not dispositive, we also note that defendants failed to follow their own procedures in reviewing Senesackda's "administrative segregation." In fact, it was obvious from the testimony that personnel at the detention center were not sure whether Senesackda had been assigned to "lock-down" for punitive reasons or "administrative-segregation" for security reasons.

According to the testimony of Captain Petray, a decision to hold an inmate in administrative segregation is reviewed every thirty days. In Senesackda's case, these reviews did not occur. Moreover, the "paperwork" showing that Senesackda was in fact in administrative segregation was not completed until April 5, 2005. While this may have been a mere oversight, it certainly underscores the fact that neither the procedures for placing Senesackda on lock-down, which would have involved a disciplinary hearing, or placing him on administrative segregation were followed. Defendants suggested the confusion was partially caused by the fact that Senesackda was being criminally charged with battery in connection with the incident. However, it is clear that Senesackda could not be punished merely because of this pending criminal charge.

An intent to punish establishes unconstitutional pretrial punishment. *Magluta v. Samples*,

375 F.3d 1269, 1276 (11th Cir. 2004)(citation omitted). We therefore conclude Senesackda has established that the conditions under which he was detained after October 7th were the equivalent of punishment.

"A pre-trial detainee is entitled the procedural protections of *Wolff v. McDonnell*, 418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974), before imposition of punishment for a disciplinary infraction." *Jones v. Brown*, 300 F. Supp. 2d 674, 678 (N.D. Ind. 2003). It is undisputed that Senesackda did not receive any type of hearing prior to, or after, his assignment to "administrative segregation" or lock-down from October 7, 2004, for the remainder of his incarceration at the facility. He was not given notice of the claimed rule violations, afforded the right to call witnesses, or given a statement by a disciplinary committee of its findings.

We turn to the issue of what relief Senesackda should be awarded. Compensatory damages under § 1983 are governed by general tort-law compensation theory. *See Carey v. Piphus*, 435 U.S. 247, 255, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978). In *Carey*, the Supreme Court noted that damages are available under § 1983 for actions "found . . . to have been violative of . . . constitutional rights and to have caused compensable injury." *Id.* (internal quotation marks and citations omitted). The law generally provides that damages may be awarded for injuries such as mental anguish and suffering, personal humiliation, and monetary losses. *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 307, 106 S. Ct. 2537, 91 L. Ed. 2d 249 (1986)(citations omitted). However, damages may not be awarded for the abstract or subjective value of the constitutional right at issue. *See Stachura*, 477 U.S. at 308; *Carey*, 435 U.S. at 248.

The generally applicable rules have been altered when it comes to civil rights actions brought by prisoners. Codified as 42 U.S.C. § 1997e(e), section 803(d) of the Prison Litigation Reform Act of 1996 (PLRA) provides as follows: "No Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."

In *Royal v. Kautzky*, 375 F.3d 720, 723 (8th Cir. 2004), a case in which plaintiff argued he had been retaliated against for filing complaints and grievances, the Court of Appeals for the Eighth Circuit ruled that the physical injury requirement of the PLRA "limit[ed] recovery for mental or emotional injury in all federal actions brought by prisoners." The court also noted that Royal could not recover some indescribable and indefinite damage allegedly arising from a violation of his constitutional rights. *Id.* at 724. Section 1997e(e), however, did not bar the recovery of other types of relief such as nominal damages, punitive damages, and injunctive and declaratory relief. *Id.* Section 1997e(e) bars Senesackda from recovering compensatory damages for the mental and emotional injuries he suffered. In cases where it was found an inmate's constitutional rights were violated by improper confinement to administrative segregation or solitary confinement, the courts have found it appropriate to rely on a per day amount in assessing damages. *See e.g., Stevens v. McHan*, 3 F.3d 1204, 1207 (8th Cir. 1993). While we may not award Senesackda compensatory damages, we believe it is appropriate to award him nominal damages on a per day basis. Accordingly, we will recommend that Senesackda be awarded nominal damages in the amount of $1 per day for each day he was confined in more restrictive conditions following the incident with Lisenbee on October 1, 2004,. Senesackda was housed in these conditions a total of one hundred and eighty-two days–from October 7, 2004,

-17-

when his ten day lock-down for which he did receive a disciplinary hearing would have ended until April 7, 2005. We also recommend that the defendants be required to pay the filing fee of $250 that has been assessed against Senesackda.

We turn to the question of whether an award of punitive damages is appropriate in this case. Punitive damages may be awarded at the discretion of the fact finder once sufficiently serious misconduct by the one or more of the defendants is shown to exist. *Smith v. Wade*, 461 U.S. 30, 52, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983). The purpose of punitive damages is to punish the defendants and/or deter similar conduct in the future. *See Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 19-20, 111 S. Ct. 1032, 1044, 113 L. Ed. 2d 1 (1991). In § 1983 cases it has been said that punitive damages are appropriate "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Walters v. Grossheim*, 990 F.2d 381, 385 (8th Cir. 1993)(internal quotation marks and citation omitted).

Having given careful consideration to testimony elicited at the evidentiary hearing, we conclude Senesackda is not entitled to an award of punitive damages. Although we concluded Senesackda's confinement constituted punishment and therefore violated the Due Process Clause, we do not believe the evidence elicited shows the conduct was motivated by evil motive or intent or involved reckless or callous indifference to Senesackda's federally protected rights.

### III. CONCLUSION

I therefore recommend the following: First, I recommend judgment be entered in Senesackda's favor against the defendants; Second, I recommend that Senesackda be awarded nominal damages in the amount of $1 per day for the one hundred and eighty-two days he was

confined in punitive housing conditions for a total nominal damages award of $182; Finally, I recommend that the defendants be required to pay the $250 filing fee that has been assessed against Senesackda.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 25th day of May 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)